UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ARMIJO,<br>　　　　Plaintiff,<br>　　v.<br>NANCY A. BERRYHILL,<br>　　　　Defendant. | Case No. 18-cv-00841-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 20, 24 |

　　　　In March 2014, Plaintiff Daniel Armijo filed an application for child's insurance benefits based on disability as well as an application for supplemental security income. *See, e.g.*, AR 172 (SSI application). In both applications, he claimed disability beginning October 31, 2012. Mr. Armijo's applications were initially denied in June 2014, *see* AR 109, 113 (notice of disapproved claims), and then upon reconsideration in August 2014. *See* AR 121 (notice of reconsideration). Mr. Armijo then requested a hearing before an administrative law judge ("ALJ"). *See* AR 127 (request for hearing). A hearing was held before ALJ Bradlee S. Welton in April 2016. *See* AR 34-63 (hearing transcript). Subsequently, on December 6, 2016, ALJ Welton issued his decision, concluding that Mr. Armijo was not disabled from October 31, 2012 (the alleged onset date) through the date of his decision. *See* AR 26 (ALJ decision). Mr. Armijo asked that the Appeals Council for the Social Security Administration review the ALJ's decision, *see* AR 170 (letter), but that request was denied, thus leaving the ALJ's decision as the final decision of the agency. *See* AR 1 (notice of Appeals Council action). Mr. Armijo then initiated the instant action, challenging the ALJ's decision.

　　　　Mr. Armijo exhausted his administrative remedies with respect to his claim of disability.

This Court has jurisdiction to review pursuant to 42 U.S.C. § 405(g). Mr. Armijo has moved for summary judgment, seeking a reversal of the Commissioner's decision and a remand for an immediate award of benefits. The Commissioner has cross-moved for summary judgment. Having considered the parties' briefs and accompanying submissions, including but not limited to the administrative record, and good cause appearing therefor, the Court hereby **DENIES** Mr. Armijo's motion for summary judgment and **GRANTS** the Commissioner's cross-motion.

## I. FACTUAL & PROCEDURAL BACKGROUND

In March 2014, Mr. Armijo applied for benefits, claiming that he suffered from paranoid schizophrenia and anxiety. *See* AR 109, 113 (notice of disapproved claims). As noted above, ALJ Welton subsequently rejected Mr. Armijo's claims for benefits, applying the five-step sequential evaluation process provided for by the relevant regulations.

> "Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations. Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities. Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given appendix. Benefits are awarded at step three if claimants are disabled. Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work. Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government. Claimants not disqualified by step five are eligible for benefits."

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

In the instant case, the ALJ made the following rulings regarding the five steps.

At step one, the ALJ found that Mr. Armijo had not engaged in substantial gainful activity since October 31, 2012, the alleged onset date. *See* AR 19 (ALJ decision).

At step two, the ALJ determined that Mr. Armijo had severe impairments such as generalized anxiety disorder and schizoaffective disorder. *See* AR 19 (ALJ decision).

At step three, the ALJ concluded that Mr. Armijo did not have an impairment or combination of impairments that met or medically equaled the severity of the one of the listed impairments in the regulations. *See* AR 20 (ALJ decision).

At step four, the ALJ first noted that Mr. Armijo had "the residual functional capacity to perform a full range of work at all exertional levels" but then added that he did have certain "nonexertional limitations." AR 22 (ALJ decision). More specifically, he was "limited to simple, routine, and repetitive tasks in a low stress environment with only occasional decisionmaking, occasional changes in work setting, [and] only occasional judgment required on the job; no fast-paced production work; no interaction with the public [and] no tandem tasks with co-workers; no interaction with co-workers; and only occasional supervision, defined as a job performed in isolation." AR 22 (ALJ decision). However, this residual functional capacity ("RFC") had no impact on past relevant work at step two because Mr. Armijo had no past relevant work of which to speak. *See* AR 25 (ALJ decision).

Finally, at step five, based on, *inter alia*, the above RFC, the ALJ held that "there are jobs that exist in significant numbers in the national economy that [Mr. Armijo] can still perform" – *e.g.*, cleaner, auto detailer, and night cleaner. AR 25-26 (ALJ decision). The ALJ therefore concluded that Mr. Armijo was not disabled from the alleged onset date through the date of the ALJ's decision. *See* AR 26 (ALJ decision).

## II. DISCUSSION

### A. Legal Standard

After a final decision on a claim for benefits by the Commissioner, the claimant may seek judicial review of that decision by a district court. *See* 42 U.S.C. § 405(g). The Commissioner's decision will be disturbed only if the ALJ has committed legal error or if the ALJ's findings are not supported by substantial evidence. *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006) ("We will uphold the Commissioner's denial of benefits if the Commissioner applied the correct legal standards and substantial evidence supports the decision."). Substantial evidence is relevant evidence – "more than a scintilla, but less than a preponderance" – that a reasonable mind may accept to support a conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). A court evaluates "the record as a whole, . . . weighing both the evidence that supports and detracts from the ALJ's conclusion" to determine if substantial evidence supports a finding. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). If the evidence supports "more

than one rational interpretation," the Court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

In the instant case, Mr. Armijo makes only one argument: that the ALJ's RFC assessment was not supported by substantial evidence because the ALJ improperly discounted the opinion of one of Mr. Armijo's treating physicians, Dr. Tonnu.

B.  Dr. Tonnu's Opinion

The medical evidence of record indicates that Dr. Tonnu is a psychiatrist employed at Kaiser and that she examined Mr. Armijo one time in October 2015, after he was referred to her by another Kaiser psychiatrist, Dr. Timtiman. *See* AR 716 (medical record dated August 31, 2015); AR 702 (medical record, dated October 23, 2015). In her October 2015 medical record, Dr. Tonnu noted that other doctors had previously diagnosed Mr. Armijo as having schizophrenia and that Dr. Timtiman's "most recent diagnosis [was] anxiety, panic disorder, [and] paranoid personality disorder." AR 702 (medical record, dated October 23, 2015). Dr. Tonnu also noted that, previously, Mr. Armijo had been prescribed various psychiatric medications. *See* AR 703-04. Dr. Tonnu examined Mr. Armijo and described him as being "alert, NAD [no acute distress], engages well, [and] psychomotor normal." AR 704. She added that his mood was "anxious" but that he "does smile" and he was "[a]ppropriately jocular." AR 704. His judgment and insight were rated "good" and his cognition "grossly intact." AR 704. Her assessment was that Mr. Armijo suffered from "Psychosis NOS [not otherwise specified], Anxiety and Panic disorder." AR 704. She ruled out schizophrenia, delusional disorder, and paranoid personality disorder. *See* AR 704-05 (noting that "[h]e engages well and laughs appropriately to jokes which isn't entirely consistent with schizophrenia"). She prescribed Seroquel as medication and instructed that Mr. Armijo should continue his therapy with a Kaiser psychologist, Dr. Devore. *See* AR 705.

It appears that, after the October 2015 examination, Dr. Tonnu did not see Mr. Armijo although she authorized additional prescriptions for him for Seroquel. *See* AR 700-01 (medical record, dated December 8, 2015, and March 25, 2016); *see also* AR 50 (ALJ hearing transcript). At the ALJ hearing in April 2016, Mr. Armijo stated that he intended to see Dr. Tonnu the following month. *See* AR 51 (ALJ hearing transcript). On May 20, 2016, Dr. Tonnu completed a

4

"Mental Impairment Questionnaire" for Mr. Armijo. There is no indication that Dr. Tonnu actually saw and/or examined Mr. Armijo at or about the time she completed the questionnaire. Dr. Tonnu diagnosed Mr. Armijo with psychosis NOS and anxiety and stated that he had "daily auditory hallucinations, chronic paranoid delusions, [and] daily panic attacks." AR 728 (questionnaire); *see also* AR 732. With respect to mental abilities and aptitudes, Dr. Tonnu stated that Mr. Armijo had no useful ability to function in various categories – *e.g.*, complete a normal workday and workweek without interruptions from psychologically based symptoms and deal with normal work stress. *See* AR 730. She added that Mr. Armijo had "very limited social skills, [was] easily overwhelmed, [had] poor concentration and stress tolerance," was "unable to adapt to change," and was "unable to interact socially without severe anxiety." AR 731. With respect to functional limitations, Dr. Tonnu noted that Mr. Armijo had extreme difficulties in maintaining social functioning and concentration and indicated that he had or was expected to have four or more episodes of decompensation within a twelve-month period, each of at least two weeks in duration. *See* AR 732 (defining episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration persistence or pace[;] [e]pisodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)").

For purposes of this opinion, the Court assumes that Dr. Tonnu was a treating physician.[1]

---

[1] The relevant regulations at the time, *see, e.g.*, 20 C.F.R. § 404.1502, defined a treating physician as follows:

> [Y]our own physician or psychologist who has provided you with medical treatment or evaluation and who has or has had an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with a physician or psychologist when the medical evidence establishes that you see or have seen the physician or psychologist with a frequency consistent with accepted medical practice for the type of treatment and evaluation required for your medical condition(s). We may consider a physician or psychologist who has treated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment is typical for

*But see* Opp'n at 7 (arguing that Dr. Tonnu was not a treating physician). Nevertheless, even with this assumption, the Court holds that the Commissioner, and not Mr. Armijo, is entitled to summary judgment.

As an initial matter, the Court notes that Dr. Tonnu's opinions were controverted. Mr. Armijo does not dispute such. "When evidence in the record contradicts the opinion of a treating physician, the ALJ must present 'specific and legitimate reasons' for discounting the treating physician's opinion, supported by substantial evidence." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1228 (9th Cir. 2009).

Here, the ALJ did provide specific and legitimate reasons for discounting Dr. Tonnu's opinions – *i.e.*, because they were "inconsistent with the medical evidence of record and based upon a one-time evaluation." AR 24 (ALJ decision). *See, e.g.*, *Lira-Iniguez v. Astrue*, No. 1:07-cv-01054 OWW GSA, 2009 U.S. Dist. LEXIS 23802, at *36 (E.D. Cal. Mar. 24, 2009) (noting that a treating physician's opinion is not given controlling weight if it is "inconsistent with other substantial evidence in the record" and that one factor considered "in determining what weight to accord the opinion of the treating physician" is "the [l]ength of the treatment relationship and the frequency of examination") (internal quotation marks omitted).

As for whether the ALJ's reasons were supported by substantial evidence, the Court finds that they were. Most notably, Dr. Tonnu's opinion that Mr. Armijo had extreme functional limitations – based on a single examination or at most two – was not consistent with the assessments of Mr. Armijo that were made by two other treating physicians: (1) his treating psychiatrist, Dr. Timtiman, and (2) his treating psychologist, Dr. Devore. In contrast to his one-

---

your condition(s). We will not consider a physician or psychologist to be your treating physician if your relationship with the physician or psychologist is not based on your need for treatment, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the physician or psychologist to be a consulting physician or psychologist.

56 Fed. Reg. 36932 (Aug. 1, 1991); *see also Cipolla v. Colvin*, No. 16-2664, 2018 U.S. Dist. LEXIS 40696, at *18 & n.55 (E.D. Pa. Mar. 13, 2018) (stating that "[p]hysicians treating a patient within a practice share treating physician status with those in the same practice" but acknowledging a split among courts).

6

time interaction with Dr. Tonnu, Mr. Armijo saw Dr. Timtiman and Dr. Devore on a fairly regular basis from November 2012 (*i.e.*, shortly after the alleged onset date) through January 2016.[2] As the ALJ notes, the medical records of Dr. Timtiman and Dr. Devore indicate that Mr. Armijo had "mostly unremarkable mental status examinations." AR 24 (ALJ decision).

For example, Dr. Timtiman typically noted that Mr. Armijo had "psychomotor retardation" in terms of behavior, that his mood was "dysphoric," and that his thought content reflected "some paranoid preoccupations" such as "[p]eople staring at him [and] talking about him." AR 328-29 (medical record dated March 15, 2013). However, she also typically described his appearance as "healthy and appropriately dressed," his demeanor/manner as "pleasant and cooperative," his affect as "full range and appropriate," and his insight and judgment as "good." AR 328-29. In addition, she typically assessed a GAF score of 61-70 with "mild symptoms."[3] AR 329.

---

[2] *See* AR 338 (medical record dated November 7, 2012) (Dr. Devore); AR 335 (medical record dated December 18, 2012) (Dr. Devore); AR 333 (medical record dated January 10, 2013) (Dr. Timtiman); AR 331 (medical record dated January 25, 2013) (Dr. Timtiman); AR 329 (medical record dated February 22, 2013) (Dr. Timtiman); AR 328 (medical record dated March 15, 2013) (Dr. Timtiman); AR 326 (medical record dated March 25, 2013) (Dr. Devore); AR 323 (medical record dated April 16, 2013) (Dr. Timtiman); AR 321 (medical record dated April 30, 2013) (Dr. Devore); AR 319 (medical record dated May 3, 2013) (Dr. Timtiman); AR 317 (medical record dated May 17, 2013) (Dr. Timtiman); AR 316 (medical record dated June 7, 2013) (Dr. Timtiman); AR 313 (medical record dated June 21, 2013) (Dr. Timtiman); AR 312 (medical record dated July 16, 2013) (Dr. Devore); AR 308 (medical record dated August 9, 2013) (Dr. Timtiman); AR 304 (medical record dated September 5, 2013) (Dr. Devore); AR 302 (medical record dated September 27, 2013) (Dr. Timtiman); AR 301 (medical record dated October 10, 2013) (Dr. Devore); AR 299 (medical record dated November 12, 2013) (Dr. Devore); AR 298 (medical record dated November 22, 2013) (Dr. Timtiman); AR 295 (medical record dated December 17, 2013) (Dr. Devore); AR 294 (medical record dated January 3, 2014) (Dr. Timtiman); AR 291 (medical record dated January 28, 2014) (Dr. Devore); AR 289 (medical record dated March 12, 2014) (Dr. Devore); AR 634 (medical record dated April 3, 2014) (Dr. Devore); AR 637 (medical record dated April 23, 2014) (Dr. Devore); AR 641 (medical record dated April 29, 2014) (Dr. Timtiman); AR 645 (medical record dated May 28, 2014) (Dr. Devore); AR 650 (medical record dated July 14, 2014) (Dr. Devore); AR 656 (medical record dated July 22, 2014) (Dr. Timtiman); AR 688 (medical record dated September 22, 2014) (Dr. Devore); AR 692 (medical record dated September 23, 2014) (Dr. Timtiman); AR 682 (medical record dated October 24, 2014) (Dr. Timtiman); AR 676 (medical record dated November 30, 2014) (Dr. Timtiman); AR 672 (medical record dated December 22, 2014) (Dr. Devore); AR 666 (medical record dated February 22, 2015) (Dr. Timtiman); AR 662 (medical record dated April 6, 2015) (Dr. Devore); AR 696 (medical record dated May 26, 2015) (Dr. Devore); AR 724 (medical record dated June 29, 2015) (Dr. Devore); AR 714 (medical record dated August 13, 2015) (Dr. Devore); AR 720 (medical record dated January 15, 2016) (Dr. Timtiman).

[3] GAF is an acronym for Global Assessment of Functioning. "'A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.'" *Brewes v. Comm'r of SSA*, 682 F.3d 1157, 1160 n.2 (9th Cir.

As for Dr. Devore, his evaluations of Mr. Armijo were similar, although Dr. Devore generally assessed a slightly lower GAF score of 51-60, with "moderate symptoms."[4] AR 332 (medical record dated April 16, 2013). In his motion, Mr. Armijo points out that, in July 2014, Dr. Devore opined that Mr. Armijo's symptoms had "become significantly functionally impairing such that it is affecting his interpersonal relationships *and ability to find and maintain employment*." AR 651 (medical record dated July 14, 2014) (emphasis added). Nevertheless, Dr. Devore still assessed a GAF score of 51-60, with "moderate symptoms" only, which was consistent with the overall mental status examination. AR 652. Furthermore, with subsequent mental status examinations, the GAF score remained the same, and Dr. Devore did not again express an opinion similar to that above.[5] Moreover, it is notable that, around this timeframe, Dr. Timtiman began to note that Mr. Armijo "has [a] tendency to overly pathologize his symptoms," AR 676, 683, 692 (medical records dated September 23, 2014; October 24, 2014; and November 30, 2014), which, as the ALJ noted, suggests that Mr. Armijo's symptoms were "less severe" than alleged. AR 21 (ALJ decision).

Mr. Armijo protests that the GAF scores assessed by Dr. Timtiman and Dr. Devore should be given little to no weight because (1) "[t]hey were generated in the context of a clinical evaluation, not to express an opinion of Mr. Armijo's ability to perform basic work activities and

---

2012); *see also* DSM-IV at 32 (describing GAF scale). "A GAF score ranges from a rating of 0 to 100, and is divided into ten ranges" – *e.g.*, 0-10, 11-20, 21-30, and so forth. *Lilley v. Berryhill*, No. 4:17-cv-04381-KAW, 2018 U.S. Dist. LEXIS 168332, at *40 (N.D. Cal. Sep. 28, 2018).

A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some interpersonal relationships." DSM-IV at 32.

[4] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)").

[5] The Court acknowledges that, in March 2014, Dr. Devore assessed a GAF score of 41-50, with "serious symptoms." AR 290 (medical record dated March 12, 2014); DSM-IV at 32 (noting that this score indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)"). But this appears to be the only instance in which Dr. Devore's assessment was lower than 51-60.

8

to function in a full time work setting" and (2) the American Psychiatric Association has abandoned the use of GAF scores in DSM-V (published in 2013). Mot. at 7 (implicitly conceding use of GAF scores in DSM-IV). But neither of these arguments is persuasive.

First, the DSM-IV indicates on its face that a GAF score can be indicative of occupational functioning. Admittedly, "GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects," but the Ninth Circuit has still stated that "they may be a useful measurement," although such "scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability." *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014); *see also Craig v. Colvin*, 659 Fed. Appx. 381, 382 (9th Cir. 2016) (acknowledging that "GAF scores alone do not measure a patient's ability to function in a work setting" but noting that, in Administrative Message 13066, which became effective in July 2013, "the Social Security Administration (SSA) has endorsed their use as evidence of mental functioning for a disability analysis"; concluding that the ALJ "did not use [the plaintiff's] GAF scores as an isolated measure of her ability to perform work, but rather as a method of quantifying treatment physicians' qualitative assessments of her overall functioning" and thus "[t]he ALJ did not err by relying in part on these scores").

Second, although the DSM-V no longer uses GAF scores, some of the GAF scores assessed by Dr. Timtiman and Dr. Devore were made prior to the publication of the DSM-V. Furthermore, Mr. Armijo has not pointed to any authority suggesting that a GAF score assessed after the publication of the DSM-V should be given no consideration at all. Indeed, as indicated above, the Social Security Administration's Administrative Message 13066 suggests to the contrary.

The Court concludes that the medical records of Dr. Timtiman and Dr. Devore in and of themselves are sufficient to support the ALJ's decision to give little weight to the opinions of Dr. Tonnu. *See Burch*, 400 F.3d at 680-81 (noting that, if the evidence "is susceptible to more than one rational interpretation," the ALJ's decision must be upheld). But notably, there is additional medical evidence that supports the ALJ's decision. This includes Dr. Tonnu's own medical record of October 2015 (apparently, the only time she conducted a mental status examination of Mr.

Armijo). As noted above, in this record, Dr. Tonnu described Mr. Armijo as being "alert, NAD [no acute distress], engages well, [and] psychomotor normal," and, even though his mood was "anxious," he "does smile" and he was "[a]ppropriately jocular." AR 704 (medical record dated October 23, 2015). His judgment and insight were rated "good" and his cognition "grossly intact." AR 704. This medical record is consistent with the medical records of Dr. Timtiman and Dr. Devore. Moreover, Dr. Tonnu's medical record of October 2015 is difficult to square with her subsequent May 2016 opinion in which she characterized Mr. Armijo as having extreme functional limitations. For example, Dr. Tonnu indicated that Mr. Armijo had or was expected to have four or more episodes of decompensation within a twelve-month period, each of at least two weeks in duration. *See* AR 732 (questionnaire). But, as the ALJ noted in his decision, "[t]he medical evidence of record shows no episodes of decompensation and [Mr. Armijo] has no history of psychiatric hospitalizations." AR 22 (ALJ decision); *see also Bray*, 554 F.3d at 1228 ("'[T]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'").

Furthermore, in contrast to Dr. Tonnu's May 2016 opinion, an examining physician – Dr. Acenas – rendered an opinion in the same month that indicated at most moderate impairments. *See* AR 55 (Tr. at 55-56) (ALJ stating that "all I have is the sense that we have mild symptoms, for the most part" but "I'm going to have to send him out to a CE because . . . we don't have much to go on"); AR 739 (Acenas report). Nonexamining physicians expressed similar opinions. *See* AR 64-81 (Dr. Pollack); AR 85-106 (Dr. Dalton).[6]

Accordingly, the Court concludes that the ALJ provided specific and legitimate reasons supported by substantial evidence for discounting the opinions of Dr. Tonnu.

---

[6] The Court also takes note that, in addition to the medical evidence described above, Mr. Armijo's activities indicated that his limitations were not severe. As the ALJ pointed out in his decision, Mr. Armijo was able (for at least a period of time) work 20 hours per week, go to the gym, attend and pass classes, make music and art, maintain a relationship with a girlfriend, apply and interview for jobs, attend and/or participate in car shows, and sell art. AR 23-24 (ALJ decision).

### III. CONCLUSION

For the foregoing reasons, Mr. Armijo's motion for summary judgment is denied and the Commissioner's cross-motion granted. The Clerk of the Court is instructed to enter a final judgment in accordance with the above and close the file in this case.

This order disposes of Docket Nos. 20 and 24.

**IT IS SO ORDERED**.

Dated: December 21, 2018

EDWARD M. CHEN
United States District Judge